In re **GRANITE PARTNERS, L.P.,**
**Granite Corporation, and Quartz**
**Hedge Fund, Debtors.**

**ABF CAPITAL MANAGEMENT,**
**et al., Plaintiffs,**

v.

**KIDDER PEABODY & CO.,**
**INCORPORATED,**
**Defendant.**

**Bankruptcy Nos. 94 B 41683-94 B 41685.**
**Adv. No. 96/9252A.**

United States Bankruptcy Court,
S.D. New York.

July 16, 1997.

See also 208 B.R. 332.

Berlack, Israels & Liberman LLP for Plaintiffs New York City (Steven E. Greenbaum, Edward S. Weisfelner, of counsel), for Plaintiffs.

Cleary Gottlieb Steen & Hamilton, New York City (Thomas J. Moloney, Mitchell A. Lowenthal, Robin A. Henry, Carmine D. Boccuzzi, Jr., of counsel), for Kidder Peabody & Co., Inc.

## MEMORANDUM DECISION DENYING MOTION TO DISMISS EQUITABLE SUBORDINATION COMPLAINT

STUART M. BERNSTEIN, Bankruptcy Judge.

The plaintiffs in this adversary proceeding have filed claims based upon securities and common law fraud in the Debtors' bankruptcy cases, but the Court has subordinated these claims pursuant to 11 U.S.C. § 510(b). *See In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr.S.D.N.Y.1997). Contending, *inter alia*, that the defendant, Kidder Peabody & Co., Inc. ("Kidder" or the "defendant"), aided and abetted that fraud, the plaintiffs now seek to equitably subordinate Kidder's claim to their own subordinated claims.

Kidder has moved to dismiss the complaint. It contends, in the main, that the plaintiffs lack standing and that their complaint fails to state a claim upon which relief

can be granted. For the reasons that follow, the Court denies the motion.

## BACKGROUND

### A. The Complaint

According to their complaint, the plaintiffs consist of thirty-eight entities or individuals who invested the approximate, aggregate sum of $230 million in Granite Partners, L.P. ("Partners"), Granite Corporation ("Corp."), and Quartz Hedge Fund ("Quartz" and collectively, the "Debtors" or "Funds").[1] (Complaint ¶¶ 1, 10.) The Funds, who are not parties to this action, were investment vehicles created primarily to invest in mortgage-related securities. (*Id.* at ¶¶ 15–17.) Kidder is a broker-dealer who created, sold and brokered a substantial portion of the securities bought and sold by the Debtors. (*Id.* at ¶ 14.) At all relevant times, either David Askin or Askin Capital Management ("ACM") acted as the Funds' investment advisor. (*Id.* at ¶¶ 18, 19.)

The Complaint sets out a litany of false representations by the Funds, through Askin and ACM, from mid–1991 through March 1994, when the Funds collapsed. These include the following: the Funds would make low risk investments in collateralized mortgage obligations, or CMOs, (*id.* at ¶¶ 40, 43–51); the investments would be market neutral in the case of Partners and Corp., and achieve a stable return of 15%, (*id.* at ¶ 41), and market directional in the case of Quartz, and achieve a 20% return through a hedged portfolio, (*id.*); all purchase and sale decisions would be based on the Debtors' proprietary computer models, (*id.* at ¶ 56); and finally, the Funds would maintain a high level of liquidity, (*id.* at ¶ 59), and maintain conservative leverage ratios; for Partners and Corp., the debt to equity ratio would be no more than 3:1, and the Quartz leverage ratio would be between 4:1 and 7:1. (*Id.* at ¶ 60.) These false representations induced the plaintiffs to make their initial investments, and then retain their investments, until the Funds collapsed in March of 1994. (*Id.* at ¶¶ 62–63.)

Kidder was not only aware of the fraudulent scheme, (*see id.* at ¶ 69); it actively participated in it. Kidder forced the Funds to purchase inappropriately bullish securities. (*Id.* at ¶ 96.) It sold the Debtors the most volatile tranches of CMOs—known as "deal drivers"—which it had to sell in order to price and sell the remaining tranches. (*Id.* at ¶ 71.) This practice enabled Kidder to generate most of its trading profits. (*Id.* at ¶¶ 77–78.) Kidder also granted the Debtors special credit accommodations in violation of its own credit policies. (*Id.* at ¶ 123.) This permitted the Debtors to increase their borrowing and buy even more "toxic" securities from Kidder. (*Id.* at ¶¶ 123, 128.) In addition, Kidder helped the Debtors post false performance marks. (*Id.* at ¶ 131.) The Debtors reported the "rosy" performance results to their investors, making it appear that the investments were performing as promised. (*Id.* at ¶¶ 131–32.)

Lastly, the plaintiffs allege that with the Funds on the verge of collapse, Kidder made inappropriate and illegal margin calls which it knew the Funds could not meet. (*Id.* at ¶¶ 146–48.) Kidder did so to secure the remaining equity in the Funds at the plaintiffs' expense. (*Id.* at ¶ 149.) When the Debtors proved unable to meet the margin calls, Kidder engaged in an illegal and collusive liquidation auction of the Debtors' assets with other brokers. (*Id.* ¶ 150.) The "rigged" liquidation process allowed Kidder to obtain the Debtors' securities at depressed prices and simultaneously create an apparent but false deficiency to support an inflated bankruptcy claim. (*Id.*)

As a result of Kidder's unfair and inequitable conduct, its material assistance and aiding and abetting the Debtors', ACM's and Askin's fraud and breach of fiduciary duties, Kidder was instrumental in causing the plaintiffs' losses. (*Id.* at ¶ 169.) Its wrongful acts contributed to the plaintiffs' initial and subsequent investments in the Debtors, and their decision to retain their investments. (*Id.* at ¶ 170.)

---

1. The plaintiffs also comprise all of the members of the Unofficial Investors' Committee ("UIC") discussed in *Granite,* 208 B.R. 332.

The plaintiffs also allege that after the Chapter 11 filings and the appointment of a Trustee, Kidder's misconduct continued unabated. Kidder hampered and delayed the Trustee's investigation. (*Id.* at ¶ 172.) Furthermore, Kidder relied on its inflated claim to secure its appointment to the official creditors' committee, and eventually, to become its chairman. (*Id.* at ¶ 173.) Having undertaken fiduciary duties to the Debtors' estates and their unsecured creditors (including the plaintiffs), Kidder breached these duties. It adversely affected the timing and results of the Trustee's investigation, his posture regarding the allowance of contested broker/dealer claims and the Trustee's objections to claims filed by the Funds' investors.

## B. District Court Case

Ordinarily, on a motion to dismiss, I would stop with the complaint. However, several subsequent events bear on my decision. The plaintiffs had previously filed a state court complaint against ACM and Kidder as well as Bear Stearns & Co., Inc. and Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") (Kidder, Bear Stearns and DLJ are referred to, collectively, as the "Broker Defendants"). With respect to the Broker Defendants, the state court complaint alleged counts based on RICO, unjust enrichment, aiding and abetting ACM's fraud and aiding and abetting ACM's breach of fiduciary duty. Except for the allegations of postpetition wrongdoing contained in the equitable subordination complaint before me, the two complaints plead the same course of conduct.

Following removal of the state court action to federal district court, the Broker Defendants moved to dismiss the complaint. Judge Sweet ruled that the RICO claims were barred under the 1995 amendments to the RICO statute, *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308, 1319 (S.D.N.Y.1997), that the plaintiffs lacked standing to assert that the Broker Defendants aided and abetted ACM's breach of fiduciary duty, *id.* at 1332–33, and that the unjust enrichment claim was deriva-

tive and belonged to the Trustee. *Id.* at 1334. The only claim to withstand the motion to dismiss alleged that the Broker Defendants aided and abetted ACM's fraud by inducing the plaintiffs to invest in the Funds, and subsequently, to retain those investments. *Id.* at 1328–31; *accord Granite,* 208 B.R. at 335–36.

The plaintiffs subsequently moved for reargument, contending, *inter alia,* that the claim based on aiding and abetting ACM's breach of fiduciary duty should not have been dismissed. Judge Sweet denied reargument. *ABF Capital Management v. Askin Capital Management, L.P.*, Civ. No. 96 Civ. 2978, 1997 WL 317365 (S.D.N.Y. June 12, 1997). Consequently, the only legally sufficient claim that the plaintiffs spelled out against the Broker Defendants in their complaint pending before Judge Sweet concerns aiding and abetting ACM's fraud.

## C. Plan Confirmation, the Kidder Settlement & Plan Distribution

### 1. The Kidder Settlement

During the chapter 11 cases, the Trustee entered into a settlement agreement with Kidder. In pertinent part, Kidder agreed to reduce its aggregate $53 million claim against the three Debtors to $19 million,[2] and the Trustee agreed to allow the claims in the reduced sums. The settlement bound anyone who succeeded to the rights of the Trustee. The parties also exchanged mutual releases. Accordingly, the Trustee released Kidder, *inter alia,* from any causes of actions or claims relating to and arising directly or indirectly out of any transaction involving Kidder on the one hand, and Askin, the Funds or ACM on the other hand.

On March 3, 1997, the Court confirmed the *Trustee's Third Amended Joint Plan of Liquidation for the Debtors,* dated Jan. 27, 1997. The settlement was approved separately but in conjunction with the confirmation. The plaintiffs did not object to the settlement, and supported confirmation.

---

**2.** The reduced claims are as follows: $3,500,-000.00 against Partners, $15,100,000.00 against

Corp., and $400,000.00 against Quartz.

### 2. Distributions to Kidder

Under the Trustee's joint liquidating plan, creditors (other than the investors) holding allowed, unsecured claims against Quartz and Corp. received payment in full. The Partners' estate, however, was insolvent. To confirm the plan and facilitate payment to Partners' creditors, the Trustee entered into a settlement with the UIC which became part of the plan. Pursuant to this settlement, the Corp. estate loaned Partners' sufficient sums to purchase the broker-creditors' unsecured claims at a 10% discount. Corp. did not, however, purchase the claims held by Kidder and DLJ. This left DLJ and Kidder as the only unpaid broker-creditors in the Partners case. Further, Partners must repay the Corp. loan before paying a dividend to Kidder or DLJ (or the investors).[3]

In light of the pending subordination issues, the UIC threatened to hold up Kidder's distribution from the Corp. and Quartz estates. To meet this threat, Kidder submitted a backstop letter from General Electric Capital Services, Inc. ("GECS"), its corporate parent. GECS guaranteed repayment of any amounts distributed to Kidder which the Court subsequently orders Kidder to disgorge. *See Letter from Jeffrey S. Werner to the Hon. Stuart M. Bernstein,* dated Feb. 25, 1997. The crisis averted, Kidder received $15.5 million on account of its allowed claims against Corp. and Quartz; it has not received but is entitled to receive up to $3.5 million from Partners. The Plaintiffs seek to subordinate Kidder's allowed claims to their claims.

### DISCUSSION

### A. The Plaintiffs' Standing

Section 510(c) of the Bankruptcy Code authorizes the Court to subordinate a claim to another claim based upon equitable considerations. It states as follows:

*Notwithstanding subsections (a) and (b) of this section,* after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part f an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

(Emphasis added.)

Kidder argues that the plaintiffs lack standing under section 510(c) because their claims have been subordinated to the level of interests under section 510(b). All agree that the statute permits the equitable subordination of a claim to a claim, and conversely, forbids the equitable subordination of a claim to an interest. Kidder argues that since the plaintiffs hold only interests by virtue of the section 510(b) subordination, the Court cannot, under section 510(c), subordinate Kidder's claims to those interests. Further, the plaintiffs do not even hold allowed claims. The Trustee had objected to all of the investor "claims," arguing that they did not rely on any misrepresentations by the Debtors.[4]

■ I conclude that the subordination of the plaintiffs' claims under 11 U.S.C. § 510(b) does not bar them from seeking equitable subordination. The plaintiffs still hold fraud claims, *see* 11 U.S.C. § 101(5) (defining "claim"), *at least for equitable subordination purposes. Cf. ABF Capital Management v. Askin Capital Management, L.P.,* 1997 WL 317365, at *3 (implying that the investors lack standing as creditors to assert claims against Kidder for breach of fiduciary duty). The "notwithstanding" section 510(b) language that introduces section 510(c) plainly means that despite subordination under section 510(b), the holder of the subordinated claim may still seek equitable subordination.

Moreover, the disputed nature of the plaintiffs' claims does not affect their standing. It is true that equitable subordination concerns the rearranging of the relative priorities of

---

**3.** Partners' ability to repay the Corp. loan and pay the other unpaid claims and interests depends on recoveries in separate litigations against Bear Stearns and Merrill Lynch.

**4.** As a result of the confirmation order, the Trustee has been discharged, and the Litigation Advisory Board, created by the plan, has succeeded to this objection.

*allowed* claims, but that is because only allowed claims receive distribution. Kidder implies that the plaintiffs must first prevail on the objection before they can sue. Yet the plaintiffs' standing, the allowability of their claims and their right to equitable subordination turn on a common nucleus of facts. As discussed below, to prevail on their equitable subordination claim against Kidder, the plaintiffs must prove that Kidder aided and abetted a fraud committed by the Debtors' insider, ACM. Given the nature of the allegations against ACM, the Debtors would doubtless be vicariously liable. Thus, the plaintiffs must prove a fraud by the Debtors—and the allowability of their section 510(b) claims—to prevail on their aiding and abetting theory against Kidder. Accordingly, the plaintiffs have standing to seek equitable subordination.[5]

## B. Standards Governing Kidder's Motion to Dismiss

■ On a motion to dismiss, the factual allegations in the complaint are presumed true, and all reasonable inferences are drawn in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Luedke v. Delta Air Lines, Inc.* 159 B.R. 385, 389 (S.D.N.Y.1993); *Raine v. Lorimar Productions, Inc.,* 71 B.R. 450, 453 (S.D.N.Y.1987). Dismissal is proper only when the plaintiff would not be entitled to any type of relief, even if it prevailed on the merits of its factual allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Cohen v. Koenig,* 25 F.3d 1168, 1171–72 (2d Cir.1994); *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994); *Dopico v. Goldschmidt,* 687 F.2d 644, 649 (2d Cir.1982); *Wedtech Corp. v. Nofziger (In re Wedtech Corp.),* 88 B.R. 619, 622 (Bankr.S.D.N.Y. 1988). In addition to the complaint itself, the Court may consider the contents of any documents attached to the complaint or incorporated by reference, matters as to which it can take judicial notice, and documents in the non-moving party's possession or which it knew of or relied on in connection with its complaint. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Invs., Inc.),* 162 B.R. 426, 430 (Bankr.S.D.N.Y.1993).

■ The general elements of an equitable subordination claim are well known. The plaintiff must plead and prove, under the three-pronged test set forth in *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977), the following:

a) The claimant engaged in some type of inequitable conduct;

b) The misconduct caused injury to the creditors or conferred an unfair advantage on the claimant;

c) Equitable subordination of the claim is consistent with bankruptcy law.

*In re Mobile Steel,* 563 F.2d at 700; *accord United States v. Noland,* —— U.S. ——, ——, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996); *see generally* 4 Lawrence P. King, *et al., Collier on Bankruptcy* ("Collier") ¶ 510.05[1], at 510–13 to 510–14 (15th rev. ed.1997).

■ Traditionally, equitable subordination has been limited to cases involving (1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant. *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 838 (Bankr.S.D.N.Y.1994); *see In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1359–60 (1st Cir.1992) (equitable subordination usually applies to three situations: the fiduciary's misuse of his position to the disadvantage of creditors, third party domination and control plus disadvantage, and fraud); *In re CTS Truss, Inc.,* 868 F.2d 146, 148–49 (5th Cir.1989) (same) *see generally* 4 *Collier* ¶ 510.05[4], at 510–16 to 510–19.

---

5. Although not technically a standing issue, the remedy of equitable subordination is not limited to a trustee and one creditor may seek to equitably subordinate another creditor's claim to his own. *Boyajian v. DeFusco (In re Giorgio),* 862 F.2d 933, 939 (1st Cir.1988) (Breyer, J.); *American Cigar Co. v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 85 B.R. 965, 971 (Bankr. E.D.Pa.1988) (citing cases) ("*Paolella I* "), aff'd, 161 B.R. 107 (E.D.Pa.1993), *aff'd,* 37 F.3d 1487 (3d Cir.1994).

Thus, it is not enough to allege simply that the defendant engaged in "inequitable conduct"; the party seeking equitable subordination must allege conduct that fits within one of these three paradigms. *In re After Six, Inc.*, 177 B.R. 219, 232 (Bankr.E.D.Pa. 1995).

▆▆▆ Where noninsider, non-fiduciary claims are involved, the level of pleading and proof is even higher. *Id.* at 231–32. Although courts now agree that equitable subordination can apply to an ordinary creditor, the circumstances are "few and far between." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir.1990); *accord Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.) ("Paolella II")*, 161 B.R. 107, 119 (E.D.Pa. 1993) ("Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries."), *aff'd*, 37 F.3d 1487 (3d Cir.1994). A creditor may generally improve his position *vis-a-vis* the other creditors provided he does not receive a preference or fraudulent transfer. *In re W.T. Grant Co.*, 699 F.2d 599, 609–10 (2d Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Courts have described the degree of wrongful conduct warranting equitable subordination of an ordinary creditor's claim as "gross and egregious", "tantamount to fraud, misrepresentation, overreaching or spoilation" or "involving moral turpitude." *Nassau*, 169 B.R. at 838–39.

▆▆▆ In *Nassau*, I considered, at length, the equitable subordination of claims held by non-insider, non-fiduciary creditors. I noted that the few cases that actually subordinated an ordinary claim did so based upon a finding of actionable wrongdoing. *Id.* at 839; *see, e.g., Bowman Hardware & Elec. Co.*, 67 F.2d 792, 794–95 (7th Cir.1933) (claimant who participated in scheme to misrepresent to another creditor the existence of the claimant's loan to the debtor was equitably subordinated to that creditor's claim); *604 Columbus Ave. Realty Trust v. Capitol Bank & Trust Co. (In re 604 Columbus Ave. Realty Trust)*, 119 B.R. 350, 377 (Bankr.D.Mass.1990) (bank's claim would be equitably subordinated where bank was guilty of misappropria-

tion of loan proceeds, fraud and breach of contract and its conduct caused injury to creditors and gave it an unfair advantage), *aff'd in part and vacated in part on other grounds*, 968 F.2d 1332 (1st Cir.1992); *Bank of New Richmond v. Production Credit Ass'n (In re Osborne)*, 42 B.R. 988, 999–1000 (W.D.Wis.1984) (claimant's misrepresentation to another creditor, coupled with that creditor's justifiable reliance, supported equitable subordination of claimant's claim but only to claim of injured creditor); *see Boyajian v. DeFusco (In re Giorgio)*, 862 F.2d 933, 939 (1st Cir.1988). Accordingly, to survive a motion to dismiss an action to equitably subordinate an ordinary claim, the plaintiff must "allege facts showing fraud, illegality or breach of some other legal duty owing by [the defendant creditor] to the Debtors or their creditors." *Nassau*, 169 B.R. at 841 (footnote omitted).

## C. The Sufficiency of Plaintiffs' Complaint

▆▆▆ With this framework in mind, I turn to the sufficiency of the complaint. Except for the allegations of postpetition wrongdoing, the sufficiency of the plaintiffs' complaint is governed by Judge Sweet's earlier decisions which are described, at length, above. He sustained the plaintiffs direct claim against the Broker Defendants for aiding and abetting ACM's fraud, and rejected the others. In particular, he twice rejected the claim for aiding and abetting a breach of fiduciary duty. Based upon the discussion, *supra*, allegations of aiding and abetting ACM's fraud also satisfy the pleading requirement for equitable subordination.

The complaint also alleges wrongful conduct giving rise to derivative injuries (*e.g.*, liquidation-related claims, unjust enrichment, breach of fiduciary duty). The parties disagree over whether these allegations can support an equitable subordination action between creditors. Some cases have suggested that an individual creditor may seek equitable subordination, solely for its own benefit, based upon inequitable conduct that caused injury to the estate. *See In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990); *In re Conley*, 159 B.R. 323, 325

(Bankr.D.Idaho 1993); *NBD Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters., Inc.)*, 151 B.R. 189, 196–97 (Bankr. N.D.Ill.1993). This contravenes the principle that where inequitable conduct causes direct injury to the estate, the trustee is the proper party to assert it on behalf of the creditors. *First Bank Billings v. Feterl Mfg. Co. (In re Parker Montana Co.)*, 47 B.R. 419, 421 (D.Mont.1985); *Societa Internazionale Turismo, S.P.A. v. Barr (In re Lockwood)*, 14 B.R. 374, 381 (Bankr.E.D.N.Y.1981); *cf. Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chems., Inc.)*, 103 B.R. 1012, 1014 (Bankr.C.D.Ill.1989) (unsecured creditors' committee has standing, pursuant to court order, to assert equitable subordination claim on behalf of all unsecured creditors based on substantial injury suffered by all unsecured creditors).

I need not decide which route to take because under the circumstances of this case, the plaintiffs must limit their pleadings and proof to conduct that caused direct injuries. The Trustee has settled with Kidder and released it from liability to the estate. The plaintiffs did not object to the settlement. Hence, the release extinguishes any claims against Kidder based on conduct yielding injury to the estate, *see Melon Produce, Inc. v. Karger (In re Melon Produce, Inc.)*, 112 F.3d 1232, 1240 (1st Cir.1997); *Bezanson v. Bayside Enters., Inc. (In re Medomak Canning)*, 922 F.2d 895, 902–03 (1st Cir.1990); *see In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 607 (2d Cir.1994) (trustee's settlement extinguishes derivative claims), while leaving the plaintiffs' direct claims intact. A contrary result would undercut the finality of the settlement, increase expense and foster piecemeal litigation of interrelated equitable claims. *In re Melon Produce, Inc.*, 112 F.3d at 1240; *In re Medomak Canning*, 922 F.2d at 902.

 This leaves, for consideration, the allegations of postpetition wrongdoing, an issue neither party has briefed. Clearly, the contention that Kidder interfered with the Trustee's investigation (*see* Complaint ¶ 172) belongs to the Debtors' estates. If not subsumed by the release, the Litigation Advisory Board, which has succeeded to the Trustee's rights, may assert it. The plaintiffs may not. Similarly, the knowing and purposeful filing of an inflated claim, (*id.* at ¶ 173), constitutes an injury to estate, and does not give rise to any rights on behalf of each creditor. Otherwise, every creditor could seek sanctions against such a claimant under Federal Bankruptcy Rule 9011.

 The claims directed at Kidder, in its capacity as a member and chairman of the official creditors' committee, raise a more difficult question. The committee and its members owe a fiduciary duty to *the class* of creditors that the committee represents (*i.e.*, its constituency). *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir.1993); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y.1994); *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 199 B.R. 92, 99 (Bankr.S.D.N.Y.1996), *aff'd*, 1997 WL 31197 (S.D.N.Y. Jan. 28, 1997); *In re Caldor, Inc.*, 193 B.R. 165, 169 (Bankr. S.D.N.Y.1996); 7 *Colliers* ¶ 1103.05[2], at 1103–29. They do not, however, owe a fiduciary duty to any particular creditor, *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr.S.D.N.Y.) ("The [fiduciary] duty extends to the class as a whole, not to its individual members."), *aff'd*, 140 B.R. 347 (S.D.N.Y.1992); 7 *Colliers* ¶ 1103.05[2], at 1103–29 to 1103–30, or any other party, including the estate. *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. at 514; *In re Microboard Processing, Inc.*, 95 B.R. 283, 285 (Bankr.D.Conn.1989); 7 *Colliers* ¶ 1103.05[2], at 1103–30. Further, committee members enjoy qualified immunity for the actions they take within the scope of the authority conferred upon them by statute or the court, *Philip v. L.F. Rothschild Holdings, Inc. (In re L.F. Rothschild Holdings, Inc.)*, 163 B.R. 45, 49 (S.D.N.Y.1994); *see* 7 *Colliers* ¶ 1103.05[4], at 1103–32, and to overcome this qualified immunity, the party challenging the member's actions must plead and prove wilful misconduct or *ultra vires* activities. *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. at 514; *see Luedke v. Delta Air Lines, Inc.*, 159 B.R. at 392–93.

Here, Kidder did not owe a separate fiduciary duty to each plaintiff•that would support a personal breach of fiduciary duty

claim. Thus, each plaintiff must plead and prove that Kidder engaged in an actionable wrong which caused the plaintiff injury, or at least conferred an unfair advantage on Kidder with respect to that plaintiff. Moreover, since the plaintiffs complain about Kidder's activities as a committee member, they must allege (and ultimately prove) facts showing wilful misconduct or *ultra vires* activities.

According to the complaint, Kidder used its position "to adversely affect the timing and results of the Trustee's investigation, as well as the Trustee's posture with regard to the allowance of contested broker/dealer claims and the Trustee's objections to the allowance of claims filed by certain of the Funds' investors." (Complaint ¶ 173.) Allegations regarding interference with the Trustee's investigation duplicate the allegations set forth in paragraph 172 of the complaint, and belong to the estates. Moreover, the conclusory allegations relating to Kidder's interference with the Trustee's allowance of contested broker claims, or his objections to some investors' claims, are insufficient. The complaint does not indicate how these actions amount to wilful misconduct or *ultra vires* activities. Committees and their members frequently and properly take positions adverse to particular creditors, object to their claims and sometimes sue them. *In re Circle K Corp.*, 199 B.R. at 99–100. Thus, a committee and its members may properly oppose a Trustee's position regarding the allowance of claims. In short, the allegations in paragraph 173 of the complaint do not state a claim for equitable subordination.

**6.** Here, the equitable subordination claim offers a more attractive remedy than a money damage claim in the same amount. Kidder's parent GECS has guaranteed any amount that Kidder must disgorge by virtue of the equitable subordination of its claim, but has apparently not given a similar guarantee for a money judgment obtained in the district court.

**7.** On the other hand, the assertion of equitable subordination claims between creditors can plunge the court into the time-consuming adjudication of purely private disputes between non-debtor parties having nothing to do with their claims in the bankruptcy case. Consequently, a bankruptcy court may, under certain circumstances, rightly decline to exercise its jurisdiction. This matter, however, does not present such circumstances. As noted, the claims assert-

**D. The Adequacy of the Legal Remedy**

Kidder also opposes equitable subordination on the ground that the plaintiffs have an adequate remedy at law. They are currently suing Kidder in federal district court for their injuries based upon the same conduct that forms the basis of their equitable subordination complaint. If they prevail, and collect a judgment entered by the district court against Kidder, they will be made whole, and will not be entitled to any further legal or equitable relief.

▇ Kidder's argument applies to virtually every equitable subordination claim brought by one creditor against another, ordinary creditor. The party seeking equitable subordination must plead and prove an actionable wrong, the same wrong that he would have to prove to recover a money judgment. *See Paolella I*, 85 B.R. at 972. In this sense, equitable subordination mirrors an identical claim for legal relief, and is merely an alternative remedy for the same wrong.[6] While a plaintiff cannot recover damages and obtain equitable subordination for the same wrong, *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr.D.Del.1993), he may nevertheless, *plead* both claims for relief, *id.*; *Paolella I*, 85 B.R. at 972, and a court should not dismiss an equitable subordination claim for legal insufficiency merely because the plaintiff has also asserted a claim for damages based upon the same conduct. *See In re Century Glove, Inc.*, 151 B.R. at 332.[7]

ed by the plaintiffs against the estates and the equitable subordination claim against Kidder arise from the same nucleus of facts, and are intertwined. The amounts involved are such that the resolution of the equitable subordination claim may have a substantial impact on the distributions in these bankruptcy cases. Finally, the district court has already determined that it will retain noncore, bankruptcy jurisdiction over the plaintiffs' money damage claims. *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. at 1322. Hence, adjudication of the equitable subordination claim, either directly by the district court or indirectly based upon the collateral estoppel effect given to any judgment it enters, will promote judicial economy without interfering with the administration of these estates.

### E. The Parties' Other Contentions

The Court has considered the parties remaining arguments, and concludes that they lack merit. In particular, the plaintiffs cannot be denied their right to pursue this claim for equitable subordination based upon their failure to assert the claim in the pending civil action. The plaintiffs commenced the civil action in state court, but Kidder removed it to federal court. Since equitable subordination is a remedy unique to bankruptcy, *see In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 854 (E.D.N.Y.1995); *see generally* Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law. 417, 421–29 (1985), the plaintiffs could not have sought such relief in their original complaint.

Further, the plaintiffs could not have sought equitable subordination, in the first instance, in the district court. Claims for equitable subordination are core, *Paolella II*, 161 B.R. at 116, and are automatically referred to the bankruptcy court under the general order of reference. To prosecute the claim in district court, the plaintiffs would have to file the equitable subordination complaint, as they have, in the bankruptcy court, and then seek withdrawal of the reference.

### CONCLUSION

Kidder's motion to dismiss the plaintiffs' equitable subordination complaint is denied. However, their claim is coextensive with their remaining money damage claims still pending against Kidder in the district court, and simply provides an alternative, equitable remedy for the same wrongful conduct. The parties are directed to contact chambers to schedule a conference at which time the method of resolving the equitable subordination claim will be addressed.

Settle order on notice.